U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described**.

**Signed August 2, 2006**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| RICKY KLEIBRINK, | § | CASE NO. 05-80286-BJH-13 |
| | § | |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |

### Memorandum Opinion and Order

Before the Court are two motions filed by Wilmington Trust Company ("Wilmington") for relief from the automatic stay, which are opposed. The dispute is best understood after a review of the extensive proceedings in this and a prior bankruptcy case.

## I.      Factual and Procedural Background

### A.      The Prior Proceedings

Ricky Kleibrink (the "Debtor") filed a voluntary petition for relief under Chapter 13 on

August 31, 2001 (the "First Case"). The First Case was dismissed on May 10, 2002, prior to confirmation of a Chapter 13 plan of reorganization. The Debtor filed a second voluntary petition for relief under Chapter 13 on February 3, 2003, which was assigned Case No. 03-31271-BJH-13 (the "Second Case"). The events in the Second Case form the basis for the dispute in the present, and third, bankruptcy case.

On March 18, 2003, Wilmington filed a motion to dismiss the Second Case with prejudice (the "Motion to Dismiss"). The Motion to Dismiss alleged that in 1996, the Debtor and Ellen E. Kleibrink ("Ellen Kleibrink") entered into a retail installment contract (the "Note") with Jim Walter Homes, Inc., to purchase a home located at 1592 Poetry Rd., Royse City, Texas (the "Property"), and as security for the purchase price, gave Jim Walter Homes, Inc. a purchase money security interest in the Property, which was subsequently assigned to Wilmington. The Note called for 360 monthly payments of $606.20. The Motion to Dismiss further alleged that in early 2001, as a result of the Debtor's failure to make monthly payments on the Note, Wilmington began foreclosure proceedings, which were stayed by the Debtor's filing of the First Case. Wilmington further alleged that once the First Case was dismissed, it once again set a foreclosure sale for February 4, 2003, which was stayed by the Debtor's filing of the Second Case. Wilmington asserted that the Debtor had not made any payments on the Note since January of 2002, and that Wilmington was owed $10,998.93 in pre-petition arrears, insurance expenses, late charges, and attorney's fees. Wilmington also contended that the Debtor was delinquent in his post-petition Note payments, and had failed to maintain insurance on the Property.

The Debtor opposed the Motion to Dismiss and, among other things, denied that the Note and security interest had been transferred to Wilmington. After a hearing on June 19, 2003, the

**Memorandum Opinion and Order** **Page 2**

Motion to Dismiss was denied.

On that same date, Wilmington filed a proof of claim in the Second Case, identified as Claim No. 6 on the Court's claim register. Claim No. 6 included an arrearage of $10,468.93 and was based upon a home mortgage debt incurred on November 6, 1996 secured by collateral valued at $86,325.92.

On December 30, 2003, the Debtor filed a Chapter 13 plan (the "Plan") and an objection to certain proofs of claim in the Second Case, including the claim of Wilmington (the "Claim Objection"). With respect to Wilmington, the Claim Objection stated:

## II. Specific Objections

Debtor(s) hereby object to the following claims for the reason(s) indicated in Column 6. The claims should be ALLOWED/DISALLOWED as indicated in Column 3 for the amount and class indicated in Columns 4 and 5 respectively:

| 1<br>Creditor Name | 2<br>Claim Amount | 3<br>Allow/ Disallow | 4<br>Amount | 5<br>Class (S,P,U) | 6<br>Reason(s) (See Code Below) | 7<br>CL # |
|---|---|---|---|---|---|---|
| Wilmington Trust Company | $10,468.93 | Allow | 0 | U | S-5, S-6, O-2 | 011[1] |
| Wilmington Trust Company | $86,325.92 | Allow | 0 | U | S-3, S-6, O-2 | 021 |

The "Reason(s)" codes referenced in column 6 stated as follows:

---

[1] As noted above, Wilmington's claim was Claim No. 6 on the Court's claims register. Moreover, on January 30, 2004, after the Claim Objection was filed but before any order was entered, Wilmington filed Claim No. 12, which it indicated replaced its prior proof of claim (Claim No. 6). The amount of the claim was unchanged by Claim No. 12, but the amount of arrears changed from $10,468,93 to $10,998.93. Moreover, the creditor's name was identified on Claim No. 6 as "Wilmington Trust Company," but was identified on Claim No. 12 as "Wilmington Trust Company a/k/a Mid State Homes, Inc. a/k/a Jim Walter Homes, Inc." The Court is at a loss to explain why the Claim Objection makes reference to Claim Nos. 11 and 21. The only claim on file by Wilmington at the time the Claim Objection was filed was Claim No. 6.

S-3: Claimant filed a "Secured" Proof of Claim but did not attach sufficient and/or legible documents to evidence a perfected lien or security interest in property of this Debtor's estate as required by Bankruptcy Rule 3001(d). Alternatively, claimant failed to serve on Debtor's attorney a copy of the Proof of Claim with all the attachments, as required by paragraph 7 of General Order 93-1. The claim should be ALLOWED as "Unsecured" only.

S-5: Claimant filed a "Secured" Proof of Claim. The claim includes interest, fees, or other charges which are unreasonable and/or unauthorized by law or the agreement between the parties. The claim should be DISALLOWED to the extent unreasonable or unauthorized.

O-2: Other: Failure to attach documentation providing determination of amounts owed, date(s) debt incurred and total amount claimed to be due.

Claim Objection, p. 3 (Doc. No. 29 in the Second Case).[2] On December 31, 2003, notice of a February 19, 2004 hearing to consider the Claim Objection and to consider confirmation of the Plan was sent to creditors, including Wilmington. On January 30, 2004, Wilmington filed a response to the Claim Objection.[3] Wilmington did not, however, appear at the February 19, 2004 pre-hearing conference on the Claim Objection or the pre-hearing conference to consider confirmation of the Plan. Accordingly, on March 1, 2004, the Court entered an order confirming the Plan (the "Confirmation Order") and an order granting the Claim Objection (the "Claim Objection Order").[4]

---

[2] Citations to documents filed by the parties and appearing on the Court's official public docket in any of the Debtor's bankruptcy cases will be referred to as "Doc. No." in the appropriate case.

[3] Wilmington's response to the Claim Objection was titled "Response to Debtor's Objection to Claims of Wilmington Trust Company and Confirmation of Debtor's Final Chapter 13 Plan," but the response did not contain any factual allegations relating to the provisions of the Plan, and the response did not request that confirmation of the Plan be denied.

[4] Because Wilmington failed to appear at the pre-hearing conference, the Confirmation Order and Claim Objection Order were submitted to the Court for entry without any formal hearing on the Court's motion docket, as is the practice in this District in Chapter 13 cases. In this District, hearings to consider confirmation and related motions are set for a pre-hearing conference at the Office of the Chapter 13 Trustee at 8:30 a.m. on specified dates monthly. If an agreement is reached or a party defaults, an appropriate order is tendered to the Court without the need for a contested hearing. If the parties are unable to reach an agreement, the Court conducts a hearing on any such contested motion at 2:00 p.m. on that same date. Therefore, if Wilmington had appeared at the pre-hearing conference and no agreement was reached, a hearing would have been held before the Court later that day.

The Plan states, in Section I (titled "Specific Provisions"), paragraph D (titled "Home Mortgage") as follows:

| Mortgagee | Arr. Amt. | Arr. Through | % | Term | Payment |
|-----------|-----------|--------------|---|------|---------|
| 1st - Wilmington Trust Company | $10,468.93 | 2/03 | 7 | | Pro Rata - *Debtor objects. |

Underneath that section, the Plan notes that "Regular payments beginning 03/03 to be paid direct." Page 2 of the Plan, in "Section II" (titled "General Provisions"), subparagraph D (titled "Principal Residence Arrearages (Home Mortgage)"), states as follows:

> Arrearages on claims secured only by a security interest in the Debtor's(s') principal residence shall be paid by the Trustee in the amount and at the Annual Percentage Rate of interest indicated on Section I, Part "D" herein. To the extent the claim is over secured, interest will be calculated from the date of the Petition, otherwise from the confirmation date. Regular payments will be paid "Direct" by the Debtor(s) beginning on the date shown in Section I, Part "D". *Such creditors shall retain their liens*.

Plan, p. 2 (Doc. No. 28 in the Second Case) (emphasis added).

Several weeks later, Wilmington filed two motions in the Second Case. First, on April 14, 2004, Wilmington filed a motion for relief from the automatic stay (the "Lift Stay Motion"). Wilmington alleged in the Lift Stay Motion that it was entitled to receive monthly payments in the amount of $606.20 outside the Plan, but that the Debtor was delinquent on four post-petition mortgage payments, and had failed to maintain insurance on the Property. The Debtor opposed the Lift Stay Motion and contended that the Claim Objection Order allowed Wilmington's claim as an unsecured claim only, and in the amount of zero. Second, on May 4, 2004, Wilmington filed a "Motion to Vacate 'Order on Debtor's Objection to Claims' and Substitute a New 'Order on

Debtor's Objection to Claims'" (the "Motion to Vacate Order on Claim Objection"). Wilmington argued that it had timely responded to the Claim Objection and had provided the Debtor with copies of documents evidencing its claim and its perfected lien on the Property. Wilmington further alleged that it failed to attend the hearing on the Claim Objection "as a result of a docketing mistake on the part of its attorneys. The failure to attend was the result of a mistake and not intentional." Motion to Vacate Order on Claim Objection, ¶ 10 (Doc. No. 48 in the Second Case). The Debtor also opposed the Motion to Vacate Order on Claim Objection.

The Lift Stay Motion and the Motion to Vacate Order on Claim Objection were heard on July 6, 2004. At that hearing, the Court denied the Motion to Vacate Order on Claim Objection without prejudice, since Wilmington did not present any evidence in support of its motion. The Court also denied the Lift Stay Motion because Wilmington did not argue or establish that it had any interest in the Property after the disallowance of its claim.

Wilmington never renewed the Motion to Vacate Order on Claim Objection. On April 18, 2005, the Court entered an Order discharging the Debtor after completion of payments under the Plan.[5] On August 24, 2005, the Court approved the Trustee's final report and the Second Case was

---

[5] Thereafter, Wilmington filed a series of motions. First, on April 27, 2005, Wilmington moved to vacate the discharge (the "Motion to Vacate Discharge"). Wilmington argued that Section 1328 of the Bankruptcy Code provides for a discharge only after the Debtor has fully complied with, and made all payments under, a confirmed Chapter 13 plan. Wilmington argued that the Debtor had not made *any* payments to Wilmington under the Plan, and that even if the Debtor had made payments to the Chapter 13 Trustee in the amount stated in the Plan, the Debtor "has not made any payments to [Wilmington], a fully secured creditor and the mortgagor on Debtor Kleibrink's principal residence." Motion to Vacate Discharge, ¶ 6 (Doc. No. 67 in the Second Case). The Debtor opposed the Motion to Vacate Discharge. Second, Wilmington filed a motion for relief from the co-debtor stay imposed by Section 1301 of the Bankruptcy Code, which the Debtor opposed. Last, Wilmington filed motions to set aside the orders denying the Lift Stay Motion and the Motion to Vacate Order on Claim Objection. The latter three motions were never heard, however, because of Wilmington's failure to set the motions for hearing. Instead, at the hearing on May 23, 2005 on the Motion to Vacate Discharge, the parties announced that they were in settlement negotiations and that they had agreed to pass that motion to a subsequent hearing date they would obtain if their settlement negotiations failed. However, no settings were ever requested. Accordingly, the Court entered an Order approving the Chapter 13 Trustee's final report and discharging the Trustee on August 24, 2005, and the case was closed on November 3, 2005.

closed on November 3, 2005. Therefore, at the conclusion of the Second Case, both the Claim Objection Order and the Confirmation Order remained final, binding, and enforceable.

### B. The Current Bankruptcy Case

On September 5, 2005, the Debtor filed his third voluntary petition for relief under Chapter 13 (the "Current Case"). The Court notes that Ellen Kleibrink was not a joint debtor in the First Case, the Second Case, or the Current Case.

On October 13, 2005, Wilmington filed two motions for relief from stay. The first motion is titled "Motion for Relief From Automatic Stay Against Collateral Consisting of Real Property and Improvements," ("Stay Motion 1") and the second motion is titled "Motion for Relief from Codebtor [sic] Stay Against Ellen E. Kleibrink a/k/a Ellen E. Goetz" ("Stay Motion 2") (collectively, the "Motions").

Stay Motion 1 alleges that Wilmington is the owner and holder of the Note, which was amended by a Correction of Retail Installment Contract and Mechanic's Lien Contract with Power of Sale, between the Kleibrinks and Jim Walter Homes, Inc. with Ron Achille as Trustee. Wilmington also alleges that it is the owner and holder of a Mechanic's Lien Contract with Power of Sale, dated November 6, 1996 between the Kleibrinks and Jim Walter Homes, Inc. with Ron Achille as Trustee, which was also amended by a Correction of Retail Installment Contract and Mechanic's Lien Contract with Power of Sale (as amended, the "Lien Contract"). Wilmington alleges that the Lien Contract evidences its properly perfected security interest in the Property. Stay Motion 1 also details the series of assignments by which Wilmington allegedly became the holder

of the Note and the Lien Contract. Stay Motion 1 further alleges that (i) as of the petition date in the Current Case, the Debtor and Ellen Kleibrink have accumulated arrears of almost $25,000 (through September 2005), (ii) the pre-petition default under the Note is not provided for in the Debtor's proposed Chapter 13 plan in the Current Case, and (iii) the Debtor's proposed plan indicates that its "Home Mortgage" section is not applicable. Additionally, Wilmington argues in Stay Motion 1 that the Debtor's proposed plan does not propose to pay Wilmington its entire secured claim, so relief from the automatic stay is warranted.

Stay Motion 2 contains many of the same allegations as Stay Motion 1, but also alleges that "as of the Petition Date, Debtor and Codebtor Kleibrink were not married but remain jointly and severally liable on the Installment Contract. [They] were married in the State of Texas on January 12, 1991 and were divorced on May 9, 2001 . . . ." Stay Motion 2, ¶ 10 (Doc. No. 14 in the Current Case). Wilmington further alleges in Stay Motion 2 that under the terms of the Note, Wilmington has a right to collect all payments from Ellen Kleibrink to the extent that they are not being made by the Debtor. Wilmington concedes that the Court entered a discharge order in favor of the Debtor in the Second Case, but contends that a discharge under Section 1328 of the Bankruptcy Code only relieves the Debtor from personal liability on scheduled debts – it does not have the effect of extinguishing the debt and creditors can prosecute a claim against co-debtors and guarantors – *i.e.*, Ellen Kleibrink.[6]

The Debtor opposes the Motions, arguing that there is equity in the Property and, as his

---

[6] Wilmington further alleges, and the Debtor does not appear to dispute, that the community property provisions of Section 524 of the Bankruptcy Code do not apply to Ellen Kleibrink because she was not the spouse of the Debtor when the Debtor filed the Second Case. *In re Von Burg*, 16 B.R. 747 (Bankr. E.D. Cal. 1982).

homestead, the Property is necessary for his reorganization. The Debtor's primary argument, however, is that the orders entered in the Second Case bar Wilmington's request for stay relief. Specifically, the Debtor argues that "[t]he Movant's claim was disallowed and any alleged interest of the movant in property of the debtor was discharged upon debtor's completion of his prior chapter 13 bankruptcy." *Response of Debtor in Opp. to Mot. for Relief from Stay filed by Wilmington Trust Co.*, ¶¶ 5 - 20 (Doc. No. 21 in the Current Case). The Debtor further asserts that "the Property alleged to be subject to the Movants [sic] claim is adequately protected because" there is equity in the Property and "Movant holds no interest in property of the debtor." *Id*. at ¶ 20.[7]

The Court held a preliminary hearing on the Motions on November 1, 2005, but directed further briefing and argument.[8] The briefs were filed and a further hearing was held on January 3, 2006, at which point the Motions were set for a final hearing. The final hearing was re-set at the request of the parties several times, and was finally held on May 16, 2006. At the May 16, 2006 hearing, and after the conclusion of the evidence, the Debtor raised for the first time new theories for

---

[7] The Debtor also asserts that Wilmington has willfully violated the stay, that the Debtor has been injured, and that the Debtor is entitled to actual and punitive damages. No motion seeking that relief is on file, however, and the Debtor introduced no evidence at the hearings in support of his allegations.

[8] Wilmington also filed a motion to strike the Debtor's unsworn declaration because it was not signed or dated. Wilmington also argued that various paragraphs of the declaration should be stricken because they contain hearsay, are conclusory, or are inadmissible under the "best evidence" rule. Wilmington contended that none of the orders in the Second Case are properly before the Court, because Local Rule 4001.1 of the Local Rules for the Bankruptcy Court for the Northern District of Texas provides that "absent compelling circumstances, evidence presented at preliminary hearings in the Dallas Division on motions for relief from the automatic stay will be by affidavit only."

The Court does not believe that this local rule was intended to abrogate the Federal Rules of Evidence, which permit this Court to take judicial notice, "whether requested or not," of its own docket and of pleadings filed in cases before it. *Garrett v. Comcast Commun., Inc.*, No. 3:04-CV-0693-P, 2004 WL 2624679 (N.D. Tex. Nov. 17, 2004) (court can take judicial notice of the records of prior and pending proceedings of other courts). The Court therefore takes judicial notice of the fact of the entry of the prior orders, and their content, neither of which is "subject to reasonable dispute" and both of which are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The interpretation and legal effect of those orders, however, is the subject of the ruling contained in this Memorandum Opinion and Order.

his legal challenge to the Motions and, once again, the Court directed further briefing. The last of those briefs was filed on June 6, 2006, following which the Court took the Motions under advisement.

This Memorandum Opinion and Order constitutes the Court's findings of fact and conclusions of law to the extent the same are required. The Court has core jurisdiction over the parties and the Motions pursuant to 28 U.S.C. §§ 157(b)(2)(G) and 1334.

## II.   The Parties' Contentions

### A.   Stay Motion 1

In general, Wilmington contends that the Claim Objection Order in the Second Case "did not disallow its secured claim against the Property and that [its] lien survived unaffected through bankruptcy." *Brief in Supp. of Motion for Relief from Codebtor Stay Against Ellen E. Kleibrink a/k/a Ellen E. Goetz*, ¶ 2 (Doc. No. 23 in the Current Case). Wilmington also contends that neither the Confirmation Order nor the order of discharge in the Second Case impacted its lien. Wilmington further contends that even if its lien was rendered void as to the Debtor, its lien survived to the extent it was granted by Ellen Kleibrink.

Specifically, Wilmington contends that the Claim Objection in the Second Case was ambiguous, because Column 3 of the Claim Objection indicated that Wilmington's claims were "Allowed," notwithstanding the Debtor's ability to expressly use the word "Disallowed." Wilmington points out that "nowhere does the Objection state that any claims not allowed are therefore disallowed or that any claims not dealt with specifically therein are disallowed. If a debtor is going to get a free house, should the order that grants the free house not be specific in abundance?" *Id*. at ¶ 7. Moreover, Wilmington contends that (i) since Column 5 refers to

Wilmington's "U" claim (assuming the term "U" means "unsecured") and (ii) the Claim Objection states that the claim "indicated in Column 5" is being "allowed" in a zero amount, then a strict reading of the Claim Objection shows that Wilmington's *unsecured* claim was being allowed in a zero dollar amount, but that its *secured* claim was not intended to be affected. Wilmington agrees that its *unsecured* claim was properly allowed at zero, because the value of the Property was greater than the debt owing to Wilmington. Wilmington further argues that Section 506(d)[9] did not operate to void its lien because, as set forth above, its secured claim was not disallowed.

Finally, as a result of the ambiguities it sees in the Claim Objection, Wilmington contends that the notice it received of the Claim Objection hearing did not rise to the level that is necessary to extinguish its lien entirely. *Id*. at ¶ 12. "The only indication given to Wilmington that its claims would potentially be disallowed was the Objection filed by Debtor that said its unsecured claims should be 'Allowed' in a zero dollar amount. This alone is not sufficient to put Wilmington on notice that its lien would be voided upon confirmation of the plan." *Id*. Wilmington contends, citing *Kinion v. Kinion*, 207 F.3d 751 (5th Cir. 2000), that if a debtor has grounds to challenge the secured status of a loan, the debtor must file an adversary proceeding. Since no adversary proceeding was filed in the Second Case, Wilmington contends that the Debtor's discharge in the Second Case does not have any impact on Wilmington's lien, because its lien was not "challenged by appropriate and customary bankruptcy procedures." *Id*. at ¶ 14.

---

[9] Section 506(d) provides:

(d) To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void, unless –

    (1) such claim was disallowed only under section 502(b)(5) or 502(e) of this title; or

    (2) such claim is not an allowed secured claim due only to the failure of any entity to file a proof of such claim under section 501 of this title.

In contrast, the Debtor contends that "Wilmington's lien is void . . . its alleged secured claim was litigated and found unsecured in the Second Case, so the discharge, together with the Court's Order Granting Debtor's Objection to Wilmington's alleged Secured Claims voided any lien against Debtor's homestead property allegedly securing Wilmington's claim." *Debtor's Brief Opposing Motion for Relief from Debtor and Codebtor Stay Filed by Wilmington Trust Company ("Brief")*, at pp. 1-2 (Doc. No. 24 in the Current Case). The Debtor urges that the Motions constitute an effort to "relitigate the issue of whether it has a secured interest in Debtor's homestead property. Exactly the same issue was already litigated and decided as a part of this Court's judgment on the issue of the validity of Wilmington's claim and on confirmation of the Debtor's Chapter 13 bankruptcy plan in Debtor's 2003 case." *Id*. at p. 5. The Debtor therefore contends that since Wilmington did not appeal the Claim Objection Order, it is now barred from re-litigating the validity of its lien. The Debtor further points out that Wilmington never objected to confirmation of the Plan, which, as a result of the Claim Objection Order, provided for a distribution of $0.00 to Wilmington. Since the Debtor completed all payments under the Plan and received a discharge, the Debtor contends that he "needs to be able to move on with his life and have his fresh start without fear that the debts that were discharged in his prior bankruptcy will continue to resurface again and again." *Id*. at p. 6.

Finally, the Debtor contends that the Claim Objection was sufficient to challenge Wilmington's lien, and that no adversary proceeding was required. The Debtor alternatively contends that even if an adversary proceeding was required, that requirement was satisfied in the Second Case by virtue of Federal Rule of Bankruptcy Procedure 3007, which provides that when a claim objection is joined with a request for relief of a type specified in Rule 7001, the claim objection "becomes an adversary proceeding." Fed. R. Bankr. P. 3007. The Debtor argues that "Reason" code

S-3 in the Claim Objection, *see* pp. 3-4, *supra*, constituted a request to void Wilmington's lien, and thus the Claim Objection automatically became an adversary proceeding.

### B. Stay Motion 2

As to Ellen Kleibrink, Wilmington contends that she is jointly liable for payment of the debt owed to Wilmington as a co-maker of the Note. Wilmington further contends that (i) the parties' divorce did not extinguish Ellen Kleibrink's liability to Wilmington,[10] (ii) the Debtor's discharge in the Second Case did not operate to discharge *her*, since she was not a joint debtor in the Second Case, and (iii) even if Section 506(d) of the Bankruptcy Code operated to void Wilmington's lien as to the Debtor, it did not operate to void the lien granted by Ellen Kleibrink.

Ellen Kleibrink did not respond to Stay Motion 2. The Debtor, however, filed a response on his own behalf. The Debtor notes that he has no objection to permitting Wilmington to pursue his former wife individually, but he contends that Wilmington has no collateral for the debt it would try to enforce, since his "discharge in the prior completed Chapter 13 case prevents Wilmington from asserting any lien on the property of the estate in that 2003 case . . ." *Brief*, at p. 6 (Doc. No. 24 in the Current Case). The Debtor concedes that the divorce "did not affect any lien on the property," *id*. at p. 8, but essentially argues that when he and Ellen Kleibrink signed the original loan documents, they created one single lien, which was then rendered void in the Second Case. Specifically, the Debtor contends:

---

[10] Specifically, Wilmington asserts, and the Debtor does not appear to dispute, that debts undertaken during a marriage are presumed to be community debts, and community property reachable by creditors for debts incurred during marriage remains liable after a subsequent divorce and partition of the community estate, since a division of the community estate has no effect upon a creditor's recovery rights. The Court agrees. *Rush v. Montgomery Ward*, 757 S.W.2d 521, 523 (Tex. App. – Houston [14 Dist.] 1988) ("Texas courts have consistently held that a division of the community estate may not prejudice the rights of a creditor to satisfy a community debt"); *Villareal v. Laredo Nat'l Bank*, 677 S.W.2d 600 (Tex. App. – San Antonio 1984).

> There is no separate lien on Debtor's homestead property through his ex-wife. There was only one lien on the entire homestead tract. Both husband and wife have to sign the Deed of Trust granting a lien against their homestead under Texas law, but in signing, they only create one lien. Their debt was not divided or proportioned between husband and wife. The property was never partitioned. When this Court ruled that Wilmington did not have an allowed secured claim, it voided any lien allegedly held by Wilmington, in its entirety.

*Id.* at p. 9.[11]

## III.   Legal Analysis

### A.   *Overview*

A very brief review of the nature of debts and the liens given to secure their payment will be helpful to understanding the Court's analysis. A note (in this case, it takes the form of a retail installment contract) is a written promise to pay a sum certain. A note creates a contractual debt and the maker of the note is personally liable to pay that debt.[12] A lien, however, is an interest in property and is given to secure payment of a debt – *i.e.*, it gives the lienor the right to look to the collateral should the maker of the note default in his promise to pay. *Black's Law Dictionary* 941(8th ed. 2004); 11 U.S.C. § 101(37) ("'lien' means charge against or interest in property to secure payment of a debt or performance of an obligation"). Therefore, a creditor with both a note and a lien has two distinct remedies: (i) to collect on the note as a personal, contractual liability of the maker, and (ii) to recover against, or foreclose upon, specific collateral *in rem*. The filing of a petition in bankruptcy does not, without more, alter this basic scheme. Once bankruptcy intervenes, however, the parties'

---

[11] The Court notes that Debtor's counsel conceded at oral argument in January, 2006 that although the divorce decree dated May 9, 2001 required Ellen Kleibrink to execute and deliver to the Debtor a special warranty deed transferring her interest in the Property, she did not transfer legal title to the Debtor until 2006. Ellen Kleibrink thus retained legal, if not equitable, title to the Property until recently, along with the Debtor.

[12] A retail installment contract is a contract for the sale of goods under which the buyer makes periodic payments and the seller retains title to, or a security interest in, the goods. *Black's Law Dictionary* 348 (8th ed. 2004).

relative rights and obligations are subject to the provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure.

The Bankruptcy Code does not require a secured creditor – *i.e.*, a creditor with a lien – to file a proof of claim. *See* 11 U.S.C. § 501 (a creditor "may" file a proof of claim); Fed. R. Bankr. P. 3002(a) ("an *unsecured* . . . creditor must file a proof of claim . . . for the claim . .. to be allowed). The law is well established that ordinarily, liens pass through bankruptcy unaffected, *In re Orr*, 180 F.3d 656, 660 (5th Cir. 1999), and a secured creditor can ignore the bankruptcy case and look solely to his collateral in satisfaction of the debt (although he will be stayed from doing so during the pendency of the case). *In re Kinion*, 207 F.3d 751 (5th Cir. 2000).

However, should the creditor elect to seek payment of the debt as a personal obligation of the debtor, the creditor must file a proof of claim in order to be entitled to a payment of the obligation as a personal liability of the debtor (instead of from the collateral) and, once bankruptcy intervenes, payment from the bankruptcy estate. *In re Hogan*, Case. No. 04-82031 (Bankr. N.D. Tex. July 18, 2006) (slip opinion). The filing of a proof of claim, therefore, is the means through which a creditor elects to be paid as a personal liability of the debtor – *i.e.*, as relevant here, from the estate's funds under a Chapter 13 plan. *In re Macias*, 195 B.R. 659 (Bankr. W.D. Tex. 1996) (secured creditor, while entitled to ignore the bankruptcy proceedings and look solely to its collateral, must file a claim in order to receive a distribution from the estate). The filing of a proof of claim is therefore akin to an action on the underlying note.

The filing of a proof of claim is *not*, however, the means through which a creditor can foreclose on collateral – *i.e.*, to enforce the debtor's obligation *in rem*. A creditor seeking to enforce its rights against collateral must seek and obtain relief from the automatic stay in order to do so. 11

U.S.C. § 362(a)(4) (a bankruptcy petition "operates as a stay . . . of . . . any act to create, perfect, or enforce any lien against property of the estate").

It therefore follows logically that the disallowance of a proof of claim, *without more*, does not have the effect of extinguishing the lien. The disallowance of a claim means only that the creditor is not entitled to a distribution from the estate. The question then becomes – what more is required to extinguish a lien?

### B.    *Extinguishing Liens in Bankruptcy*

A bankruptcy discharge does not, in and of itself, do the trick. A bankruptcy discharge extinguishes only one mode of enforcement of a claim – namely, an action against the debtor *in personam* – while leaving intact another – namely, an action *in rem*. *Johnson v. Home State Bank*, 501 U.S. 78, 84 (1991). Nor does confirmation of a chapter 13 plan which treats a lienor as an unsecured creditor, in and of itself, do the trick. *In re Simmons*, 765 F.2d 547 (5th Cir. 1985).

As relevant here, the Court believes that there are two ways[13] in which a lien may be extinguished: (i) by operation of Section 506(d) of the Bankruptcy Code, or (ii) by providing for, and paying in full, the underlying debt under a confirmed plan. Taking the second method first, a lien will be extinguished where the debt is provided for, and paid in full under, the confirmed plan. *In re Allen*, 122 Fed. Appx. 96 (5th Cir. 2004) (unpublished disposition); *In re Stovall*, 256 B.R. 490 (Bankr. N.D. Ill. 1999). In such a situation, it is not so much that the lien is extinguished, but that the underlying debt is paid, such that the lien secures nothing and is therefore discharged. However, the rule is that where the debt is *not* paid in full under the plan, the lien remains intact and passes through

---

[13] There are, of course, actually more, although the other methods to avoid a lien are not implicated here. For example, a lien may be avoided by a motion brought under Section 522 of the Bankruptcy Code, or by the successful prosecution of certain chapter 5 claims.

the bankruptcy unaffected. *In re Allen*, 122 Fed. Appx. at 97 (affirming an order granting relief from

stay to a lien creditor who had not been paid in full under debtor's chapter 13 plan in a prior chapter

13 case in which debtor had received a discharge).

The first method of extinguishing a lien – *i.e.*, by operation of Section 506 of the Bankruptcy

Code – requires more discussion. Section 506 provides:

> (a) An allowed claim of a creditor secured by a lien on property in which the estate
> has an interest . . . is a secured claim to the extent of the value of such creditor's
> interest in the estate's interest in such property . . . and is an unsecured claim to the
> extent that the value of such creditor's interest . . . is less than the amount of such
> allowed claim. Such value shall be determined in light of the purpose of the valuation
> and of the proposed disposition or use of such property, and in conjunction with any
> hearing on such disposition or use or on a plan affecting such creditor's interest.
>                                                              * * *
> (d) To the extent that a lien secures a claim against the debtor that is not an allowed
> secured claim, such lien is void, unless –
>> (1) such claim was disallowed only under section 502(b)(5) or 502(e)
>> of this title; or
>> (2) such claim is not an allowed secured claim due only to the failure
>> of any entity to file a proof of such claim under section 501 of this
>> title.

11 U.S.C. § 506.

Moreover, the Federal Rules of Bankruptcy Procedure expressly contain two separate

mechanisms to implement Section 506. Rule 3012 provides that the court "may determine the value

of a claim secured by a lien on property in which the estate has an interest on motion of any party

in interest and after a hearing on notice to the holder of the secured claim . . . ." Rule 7001 provides

that "[a]n adversary proceeding is governed by the rules of this Part VII. The following are adversary

proceedings: . . . (2) a proceeding to determine the validity, priority, or extent of a lien or other

interest in property . . . ."

The Court concludes, for the reasons set forth below, that the mechanism described in Rule

3012 can be used to extinguish a lien when the basis for its avoidance is a valuation of the collateral under Section 506(a), but that the mechanism described in Rule 7001 is required where the basis to extinguish the lien is a challenge to its validity, priority, or extent. The Court also concludes, for the reasons set forth below, that the claim objection process may "substitute" for an adversary proceeding where the claim objection is clearly joined with a demand for relief of the kind specified in Rule 7001 – *i.e.*, where the claim objection gives clear notice that the debtor is challenging the validity, priority, or extent of the lien and seeks to abrogate a creditor's right to look to its collateral, and the debtor complies with the procedural safeguards set forth in Part VII of the Federal Rules of Bankruptcy Procedure.

By way of explanation of its conclusions, the Court turns first to *In re Sadala*, 294 B.R. 180 (Bankr. M.D. Fla. 2003). There, the court considered at length the procedural mechanisms to be employed under Section 506. First, the *Sadala* court noted that Rule 3012 specifically permits collateral valuations under Section 506(a) to be requested on motion, provided notice and an opportunity for hearing is given to the affected party. The *Sadala* court further noted that the rule "does not specifically address whether an adversary proceeding is needed to extinguish an unsecured lien under [Section] 506(d)," but concluded that "a party moving to value collateral and to void an unsecured lien under Section 506 . . . may do so by motion, unless the dispute involves a determination of the validity, priority, or extent of the underlying lien. In that case, an adversary proceeding is needed." *Sadala*, at 185. Finally, the *Sadala* court stated:

> The bankruptcy rules create two different types of proceedings for resolving disputes – contested matters and adversary proceedings – presumably because the drafters of the rules deemed certain matters of sufficient consequence to the affected party that the party deserved something more than a motion and an accelerated hearing. In reality, the differences often are blurred.

In a contested matter, the creditor receives a motion. Typically, no filing fee is required. Because many contested matters are not opposed, the responding party is given an opportunity to file a response or objection within a certain period of time. If a response is filed, the court will set a hearing. Often, the creditor will not dispute the relief requested in the motion, files no response, and the motion is granted upon notice but without the need for any hearing after the response period passes. The process provides due process in a streamlined and efficient manner.

In contrast, in an adversary proceeding, the debtor must file and formally serve a complaint upon the creditor, which identifies the party that is the object of the debtor's action, the specific relief sought, and the basis for such relief. Filing fees associated with adversary proceedings are substantial. Additionally, the debtor must serve a summons accompanied with the complaint directed to the named defendant which states, among other things, that if the party does not appear and defend, a judgment for the relief sought will be entered against it.

*Id*. at 182-183.

The *Sadala* court then noted that there is a split among the courts as to whether an adversary proceeding is required under Rule 7001 to declare a lien void if the collateral is valued at zero, and noted that the majority rule is that the appropriate procedure for lien avoidance under Section 506 in these circumstances is a motion, on the ground that "merely extinguishing the lien did not involve a determination of the validity, priority, or extent of the mortgage." *Id*. at 183. The court relied upon the definitions of those terms set forth in *In re Hoskins*, 262 B.R. 693, 697 (Bankr. E.D. Mich. 2001), as follows: "'Validity' referred to whether the lien was enforceable. 'Priority' referred to the rank held by the mortgage in relation to other claims attached to the same property. 'Extent' referred to the identification of the scope of specific property that is the subject of the lien." *Sadala*, 294 B.R. at 183 (*citing Hoskins*, 262 B.R. at 697).

In reviewing the cases espousing the so-called minority rule – *i.e.*, that an adversary proceeding is required to strip, under Section 506(d), a lien rendered unsecured by a Section 506(a) valuation, the *Sadala* court noted that on the facts of those cases, the parties actually disputed the

validity, priority, or extent of the underlying lien, and were not merely seeking to void the lien as unsecured after a Section 506(a) valuation. Therefore, the *Sadala* court concluded that the so-called minority rule, requiring an adversary proceeding to extinguish a lien, is really a rule requiring an adversary proceeding where the parties are actually disputing the validity, priority, or extent of a lien using the *Hoskins* court's definitions, and that a motion is sufficient to strip a lien where the lien stripping occurs instead as a result of a Section 506(a) valuation. This Court agrees, and therefore concludes that where a debtor challenges the validity, priority, or extent of a lien, and seeks to extinguish the lien on that basis, an adversary proceeding is required.

Against this backdrop, the Bankruptcy Code and Rules add a third potential process – *i.e.*, a claim objection. Section 502 provides that "a claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects." Rule 3007 provides:

> An objection to the allowance of a claim shall be in writing and filed. A copy of the objection with notice of the hearing thereon shall be mailed or otherwise delivered to the claimant . . . at least 30 days prior to the hearing. If an objection to a claim is joined with a demand for relief of the kind specified in Rule 7001, it becomes an adversary proceeding.

The Fifth Circuit has arguably intimated that a claim objection is the appropriate method to extinguish a lien. *See In re Simmons*, 765 F.2d 547 (5th Cir. 1985) (holding that a lien was not extinguished where no objection to the creditor's claim had been filed). The Fifth Circuit did so, however, in the context of deciding whether confirmation of a plan which treated an allegedly secured creditor as unsecured, without express language avoiding the lien, was sufficient to extinguish the lien. In *Simmons*, the Fifth Circuit held that confirmation of such a chapter 13 plan did not operate to extinguish the creditor's lien, where the debtor had not filed an objection to the creditor's claim. The Fifth Circuit stated that "the purpose of filing an objection is to join issue in

a contested matter, thereby placing the parties on notice that litigation is required to resolve an actual dispute between the parties." *Id*. at 552. The Fifth Circuit ruled that under Section 502, a proof of claim is deemed allowed unless a party in interest objects. As the debtors had not objected, the creditor's claim was deemed allowed on the date the plan was confirmed. As the creditor's claim was deemed allowed on the date the plan was confirmed, the Fifth Circuit stated that the language of Section 506, purporting to void liens to the extent they secure claims which have not been allowed, was not applicable. However, the Fifth Circuit was ruling upon the sufficiency of the plan confirmation process, and did *not* expressly address the question of whether a claim objection is sufficient to avoid a lien if the claim objection is not "joined with a demand for relief of the kind specified in Rule 7001." Fed. R. Bankr. P. 3007.

Similarly, in *In re Howard*, 972 F.2d 639 (5th Cir. 1992), the Fifth Circuit considered whether a confirmed chapter 13 plan, which purported to reduce a creditor's secured claim, is res judicata as to that creditor. The plan in the *Howard* case provided that the secured creditor would be paid $500 in full compromise of its claim against the debtors and its lien would be "lifted." In other words, the plan expressly provided for avoidance of the lien. The creditor had filed a proof of claim, but did not object to confirmation of the plan. The Fifth Circuit held that confirmation was not res judicata, and that since no objection was filed to the secured claim, the creditor was entitled to rely upon its lien. The Fifth Circuit, reviewing its earlier decision in *Simmons*, used language arguably inconsistent with this Court's ruling today. It stated that "the key to *Simmons* is the requirement that a claim be objected to before the creditor loses its ability to rely upon its lien for relief . . . the filing of an objection is all that *Simmons* requires. Once a debtor has objected to a claim, the creditor is on notice that full participation in the confirmation proceedings is required or its lien will be at risk."

*Howard*, at 642.

The Court notes that the issue before the Fifth Circuit in both *Simmons* and *Howard* was whether a *plan* was sufficient to avoid a lien. The Fifth Circuit was not expressly ruling upon the sufficiency of some other mechanism. In a more recent case, albeit in a completely different context, the Fifth Circuit has stated that "the proper procedure to challenge the secured status of a loan is an adversary proceeding to determine the validity, priority, or extent of a lien." *In re Kinion*, 207 F.3d 751 (5th Cir. 2000).[14] Other circuits have likewise held that an adversary proceeding is required to challenge a lien's validity, priority, or extent. *See, e.g., Cen-Pen Corp. v. Hanson*, 58 F.3d 89 (4th Cir. 1995) (stating that a debtor must take some affirmative step to extinguish or modify a lien during the bankruptcy process, confirmation of a plan which treats the creditor as an unsecured creditor is insufficient to extinguish that creditor's lien, and initiation of an adversary proceeding is a prerequisite to challenging the validity or existence of a lien in a chapter 13 proceeding). This Court therefore believes that *Simmons* and *Howard* are best understood as standing for the proposition that *at least* a claim objection is required before a creditor's lien will be extinguished under Section 506.

Now, to address the next question – *i.e.*, is a claim objection, by itself, sufficient to extinguish a lien? The Debtor cites *In re Robinson*, 217 B.R. 527 (Bankr. E.D. Tex. 1998) for the proposition that an objection to claim is alone sufficient to extinguish a lien. The Court disagrees, in part, and concludes that a claim objection can be, but is not always, sufficient to extinguish a lien. The basis

---

[14] In the *Kinion* case, the bankruptcy court, in an order denying approval of a reaffirmation agreement in a chapter 7 case, avoided a creditor's lien because the creditor had not complied with a local rule requiring proof of a security interest to be attached to the reaffirmation agreement. The Fifth Circuit noted, among other things, that if the debtors "believed they had grounds to challenge the secured status of [the] loan, the procedure sanctioned by the Bankruptcy Rules calls for an adversary proceeding . . . the court's order stripping [the] lien complied with none of the usual procedures." *Kinion*, at 757.

for the Court's partial disagreement is several-fold. First, *Robinson* was decided prior to the Fifth Circuit's decision in *Kinion*, *supra*. Second, the decision is not binding on this Court. Most importantly, the *Robinson* case is distinguishable on its facts. Both parties in *Robinson* were before the court vigorously defending their respective positions, the court found that the parties would suffer no prejudice from its consideration of the merits despite the absence of an adversary proceeding, and the debtors' claim objection was "clearly challenging the validity or extent of [the creditor's] lien." *Robinson*, 217 B.R. at 530.

Here, the Court is unable to conclude that Wilmington suffered no prejudice from the absence of an adversary proceeding in the Second Case. Had an adversary proceeding been filed, Wilmington would have been afforded the additional procedural protections available to defaulting parties. *See* Fed. R. Bankr. P. 7055. Moreover, the Claim Objection in the Second Case did not "clearly" notify Wilmington that not only was its secured claim at risk, but that the Debtor sought to extinguish its ability to look to its collateral, as well. The Claim Objection did not seek to "disallow" Wilmington's claim. Rather, it sought to allow the claim at a zero amount. While Wilmington's interpretation of the Claim Objection, as dealing only with its unsecured claim is strained, the Court acknowledges some ambiguity in the Claim Objection. Only when the "objection codes" are read does it become clearer that the Debtor sought to allow the claim only as an unsecured claim, thereby arguably extinguishing the lien. However, bearing in mind that the *confirmed* Plan provided that Wilmington would retain its lien, the Court believes that the Claim Objection did not clearly notify Wilmington that the Debtor sought to extinguish its lien in addition

to valuing its claim at zero.[15]

The Debtor further argues that the requirement for an adversary proceeding is satisfied by the Claim Objection in the Second Case, citing to Rule 3007. The Court disagrees with the Debtor for several reasons. First, as noted above, the Court does not believe that the Claim Objection gave clear notice that the Debtor sought to extinguish Wilmington's lien. Moreover, when a claim objection is filed which demands relief of a kind specified in Rule 7001, the practice in this district is for the Court to enter an order directing the Clerk to open an adversary proceeding, either at the request of the parties or when the nature of the claim objection is brought to the Court's attention, at a hearing on the claim objection. *See, e.g.* Order entered June 8, 2005 in Case No. 04-35574-BJH-11, Document No. 447.[16] That was not done in this case. Most importantly, the Court is hard-pressed to find that the Claim Objection in the Second Case somehow became an adversary proceeding pursuant to Rule 3007 when *none* of the adversary proceeding procedural rules were followed. The Debtor did not pay a filing fee. The Debtor did not serve the Claim Objection together with a summons. The Claim Objection was not set for trial before the Court – it was set for a pre-hearing conference at the Office of the Chapter 13 Trustee – the procedure established in this district for *motions* in Chapter 13 cases. And, the Debtor did not move for a default judgment pursuant to Rule 7055 when Wilmington failed to appear at the pre-hearing conference.

In short, the Court holds that when a debtor seeks to extinguish a lien, in addition to

[15] Moreover, the Court observes that the notation "Debtor objects" on the Plan refers only to Wilmington's *arrears* in the amount of $10,468.93 and not to any other portion of Wilmington's claim.

[16] As an example, the June 8, 2005 Order entered in the case of *In re The Heritage Organization, LLC* provided that "the allowance process for the claim of [the creditor] shall be converted to an adversary proceeding. The Clerk of Court shall open an adversary proceeding file and assign an adversary proceeding number, and . . . the file shall include the proof of claim, . . . the objection to the proof of claim, . . . and the response of [the creditor]. The Clerk of Court shall issue a scheduling order."

disallowing a claim, a motion is sufficient when the basis to avoid the lien is a Section 506(a) valuation. However, when the debtor seeks to extinguish a lien under Section 506(d), on the ground that it secures a claim which is not an allowed secured claim due to a successful challenge to the validity, priority, or extent of the lien, then an adversary proceeding is required, unless the debtor files a claim objection which affords the creditor due process before extinguishing its property right. The claim objection process may "substitute" for an adversary proceeding where the claim objection is clearly joined with a demand for relief of the kind specified in Rule 7001 – *i.e.*, where the claim objection gives clear notice that the debtor is challenging the validity, priority, or extent of the lien and seeks to abrogate a creditor's right to look to its collateral, and the debtor complies with the procedural safeguards set forth in Part VII of the Federal Rules of Bankruptcy Procedure. That was not done in the Second Case.

In the Second Case, the Debtor neither paid the debt in full under the Plan nor filed a proper proceeding to extinguish Wilmington's lien under Section 506(d). Yet the Debtor argues that the debt has been discharged, and the lien has been avoided, such that the Debtor has a free house. The Court cannot agree – bankruptcy is intended to afford the Debtor a fresh start, but not a head start.[17] *In re Godios*, 333 B.R. 644, 647 (Bankr. W.D.N.Y. 2005).

The Court concludes, for all these reasons, that Wilmington's lien survived the Second Case. The inevitable next question – *i.e.*, what good is a lien if it no longer secures a debt? – is easily answered. A discharge in bankruptcy does not extinguish the debt itself, but merely releases the

---

[17] The result in the Current Case, should the Court accept the Debtor's interpretation of the law, is more than simply a head start for the Debtor. Consider the following undisputed facts: the Debtor was awarded the Property in the divorce, and has been living there while paying nothing to Wilmington. His former wife, as a non-debtor, is still liable on the debt to Wilmington, but Wilmington would no longer have any collateral securing that debt. It therefore could (and likely would) pursue her personally for its payment.

debtor from personal liability for the debt. *Hall v. Nat'l Gypsum Co.*, 105 F.3d 225, 229 (5th Cir. 1997); *Matter of Edgeworth*, 993 F.2d 51 (5th Cir. 1993). Although the case law talks in terms of creditors being able to pursue other entities liable on a debt post-discharge, *see, e.g. Edgeworth*, the cases also recognize that creditors whose liens have survived a bankruptcy filing may also pursue actions post-discharge which are purely *in rem*. *In re Allen*, 122 Fed. Appx. 96 (5th Cir. 2004) (unpublished decision); *In re Lowther*, 52 Fed. Appx. 476 (10th Cir. 2002) (unpublished decision); *Chandler Bank of Lyons v. Ray*, 804 F.2d 577 (10th Cir. 1986) *In re Geiger*, No. 98-24461T, Civ. A. 01-2060, 2001 WL 34633702 (E.D. Pa. Jul. 9, 2001), *aff'd* 55 Fed. Appx. 82 (3rd Cir. 2003) (unpublished decision) (creditor whose lien survived confirmation could pursue its *in rem* rights upon discharge where confirmed plan provided for no payments to creditor).

### C. Other Debtor Arguments to Invalidate Wilmington's Lien

Because the Court has concluded that Wilmington's lien survived the Second Case and is therefore not "void" as to the Debtor, the Court need not address the Debtor's argument that the lien is void as to Ellen Kleibrink. The Debtor's sole basis for arguing that the lien is void as to Ellen Kleibrink is derivative – *i.e.*, the Debtor argues the lien is void as to her because the lien is void as to him. The Debtor does not contend that any of his bankruptcy cases had any independent effect on the lien granted by his former spouse, who was not a party to any of those bankruptcy cases. Accordingly, Wilmington's lien on the Property remains effective as against Ellen Kleibrink.

The Court will, however, address the additional arguments raised in connection with the Motions. As noted previously, the Debtor primarily argued that Wilmington has no lien as a result of the orders entered in the Second Case, and therefore lacks standing to seek the relief sought in the Motions. And, as noted previously, the Court has rejected those arguments. The Debtor also

argued, in both the Second Case and the Current Case, that Wilmington had not established a link between the obligee under the original loan documents and itself – *i.e.*, that Wilmington is the appropriate entity, by virtue of assignment, to seek to enforce the lien and debt granted in the documents the Kleibrinks signed back in 1996. However, at the May 16, 2006 hearing, Wilmington proved up its status as the current holder of the obligations set forth in the original loan documents.[18]

Apparently sensing the need for an alternative means to challenge the existence of Wilmington's lien, the Debtor raised orally, after the evidence was closed, and for the first time, arguments premised upon Section 50 of Article 16 of the Texas Constitution. That section currently provides several requirements for the creation of a valid lien on homestead property in Texas. The Debtor argued that Wilmington had not met its burden of proof with respect to several of the elements required by the Texas Constitution for the creation of a valid lien. For example, the Debtor argued that Wilmington failed to prove when the work on the Property began, whether the Lien Contract was executed before the fifth day after the Debtor made written application for any extension of credit, and whether the Lien Contract contained the constitutionally-required language respecting a right to rescind. Because Debtor's counsel had not previously raised these arguments and did not provide the Court with the applicable provisions of the Texas Constitution, the Court

---

[18] The Court admitted those documents into evidence without prejudice to the Debtor's right to argue that Wilmington's lien was avoided as a result of the orders entered in the Second Case. Ex. 5 is the first assignment from Jim Walter Homes, Inc. to Mid-State Homes, Inc. The acknowledgment on Ex. 5 is dated April 30, 1997, but the text of the assignment refers to a document dated May 5, 1997. The Debtor argues that this apparent error in dates renders the initial assignment, and all subsequent assignments, invalid and ineffective. The Debtor does not articulate any legal theory in support of this conclusion, and in the absence of citation to any legal authority whatsoever, the Court declines to rule that the assignments are ineffective as a result of this alleged ambiguity.

requested further briefing at the May 16 hearing.[19]

The Debtor's subsequent brief, however, failed to address any of these constitutional arguments. The Court agrees with Wilmington's offer of a likely explanation for their omission – *i.e.*, the provisions upon which the Debtor relied at the May 16 hearing were not in effect at the time the loan documents at issue here were executed and are therefore completely irrelevant to the disposition of the Motions.

Instead of addressing the new arguments raised orally at the May 16 hearing, the Debtor's subsequent brief raised yet another round of new arguments, not previously addressed in any of the pleadings. First, the Debtor argued that Wilmington failed to comply with Subchapter C of the Texas Property Code, Sections 53.051 to 53.058, which set out the requirements for perfection of a mechanic's lien. Specifically, the Debtor now asserts that Section 53.052 requires that a lien affidavit be filed with the county clerk in the county where the Property is located, but that Wilmington failed to introduce any such affidavit into evidence. The Debtor also asserts that Wilmington failed to provide evidence that it provided notice of the filed affidavit, as required by Section 53.055 of the Texas Property Code.

Wilmington responds that the original loan documents create "several overlapping types of liens/security interests which may be perfected under constitutional, statutory, contractual and common law schemes." *See Resp. of Wilmington Trust. Co. to Dbt's Mem. Of Law . . .",* ¶ 3 (Doc.

---

[19] The Debtor also argued at the May 16 hearing that the original loan documents contained errors, including one in the legal description of the Property, which were later corrected. Once again, without any citation to legal authority, the Debtor argued that the original loan documents were therefore "void" since the Kleibrinks were either defrauded or there was no meeting of the minds. The Court rejects these arguments, as there was no evidence of fraud or of a lack of a meeting of the minds, and the Debtor conceded signing both the original documents *and* the documents which corrected the alleged errors.

No. 39 in the Current Case).  Wilmington further contends that the Kleibrinks pledged the Property

as security for their performance under the Note, and that paragraph 9 of the Lien Contract provides

that the Kleibrinks conveyed a security interest with power of sale to enforce that interest, as it states

that:

> to additionally secure and enforce the obligation of Buyer to pay the sum described
> above and in consideration of the promises herein above set forth and set forth in the
> Retail Installment Contract, has granted, bargained, and sold, and by these presents
> does grant, bargain, and sell unto Ron Achille As Trustee, and to his successors in
> this trust all the hereinabove described real property and improvements: to have and
> to hold the said premises unto the said Trustee or his successor in interest.

Wilmington further contends that Paragraph 16 of the Lien Contract gives the trustee the power to

conduct a non-judicial foreclosure sale of the Property in the event of a default on the Note.

Next, while Wilmington concedes that Texas Property Code Section 41.001(b) provides that

encumbrances on a homestead to secure purchase money or improvements must comply with Texas

Property Code Section 53.254(a), (b) and (c), Wilmington argues that Section 41.001(b) does not

otherwise require compliance with the other provisions of Chapter 53; therefore, the Debtor's

arguments that Wilmington must comply with Section 53.052 are misplaced.

Last, Wilmington responds that the Debtor's most recent argument contradicts previous

statements and pleadings in evidence, in that (i) the Debtor's Schedule D listed Wilmington as a

secured creditor, and (ii) the recent Warranty Deed conveying the Property from Ellen Kleibrink to

the Debtor pursuant to the divorce decree, which Warranty Deed was admitted into evidence as Ex.

29, states that the "Note is secured by a vendor's lien retained in a deed dated January 27, 1997 from

Ricky Kleibrink and Ellen Kleibrink to Jim Walter Home, and additionally secured by a deed of trust

dated January 27, 1997, from [the Kleibrinks] . . . recorded in Volume 1197, page 258, of the official

public records of real property of Rockwall County, Texas." *Resp. of Wilmington Trust Co. to Dbt's Mem. Of Law . . .",* at ¶ 6 (Doc. No. 39 in the Current Case). Wilmington asserts that the deed of trust recorded in Volume 1197, page 258, is the Lien Contract.

Both the Debtor and Wilmington are less than clear about their respective contentions regarding the nature of the lien created by the loan documents. Moreover, the original loan documents contain both titles and terms which are consistent with several different types of liens, each requiring its own method of perfection. For example, paragraph 5 of the Note embodies the parties' agreement that the Kleibrinks would execute a "Mechanic's Lien Contract" covering the real property and the house to be built on it to secure payment of the debt. Paragraph 9 of the Note recognizes that execution of the mechanic's lien contract would grant to Jim Walter Homes a "purchase money security interest, described as a contractual mechanic's lien." *See* Ex. 1, ¶ 9. The Note further provides that "as a result of this transaction, Seller also acquires a constitutional mechanic's and materialman's lien, under Article 16, Section 37 of the Constitution of the State of Texas." *Id*. The Lien Contract also states that to secure payment of the sums required by the Note, the seller "retains a purchase money security interest, described as a contractual mechanic's lien," and further provides that the seller "acquires a constitutional mechanic's and materialman's lien under Article 16, Section 37 of the Constitution of the State of Texas." *See* Ex. 3, p. 2. In addition, the Lien Contract provides that the Kleibrinks "to additionally secure and enforce [their] obligation . . . to pay the sum described . . . granted, bargained, and sold, and by these presents does grant, bargain, and sell unto Ron Achille, as Trustee, and to his successors in this trust all the hereinabove described real property and improvements: to have and to hold the said premises unto the said Trustee or his successor in trust." *Id*. The Lien Contract also contains provisions which permit the

Trustee, upon default and acceleration, to sell the property at public auction after certain procedural steps are taken. At varying times and in varying places, the documents and the parties describe the lien as a "contractual mechanic's lien," a deed of trust, a constitutional mechanic's lien, a purchase money security interest, and a vendor's lien.

After carefully reviewing all of the loan documents, and for the reasons set forth below, the Court concludes that, at the very least, Wilmington holds a valid and enforceable mechanic's lien under Article 16, Section 37 of the Texas Constitution. An exhaustive discussion of the nature and history of, and perfection requirements for, both statutory and constitutional liens in Texas, dating back to the Republic of Texas, is set forth in *Cavazos v. Munoz*, 305 B.R. 661 (S.D. Tex. 2004) and will not be repeated here. As the *Cavazos* court noted:

> Due to the numerous changes in the constitutional and statutory provisions pertaining to mechanics' liens and the myriad cases construing – and, at times, misconstruing – these provisions over the past 165 years, courts have not always been consistent or as specific as they might have been in some of their observations and rulings. Consequently, the body of case law on such liens is not a model of clarity, and it is doubtful that all the germane cases could be reconciled.

*Id*. at 668. Nevertheless, a brief review will be helpful.

Mechanic's and materialman's liens "are creatures of both the Texas Constitution and the Texas Legislature. A statutory lien exists through compliance with applicable statutes, while a constitutional lien arises by virtue of the Constitution without the aid of statutes." *Apex Fin'l Corp. v. Brown*, 7 S.W.3d 820, 830 (Tex. App. – Texarkana 1999).[20] The constitutional lien is "self-executing, and the lien exists independently and apart from any legislative act." *Garcia v. Rutledge*,

---

[20] Most courts speak in terms of two types of mechanic's liens – statutory and constitutional – though this Court agrees with the *Cavazos* court that the source of *all* mechanic's liens in Texas is its constitution, and that Section 50 of Article 16 of the Constitution and Chapter 53 of the Texas Property Code merely regulate enforcement of such liens against homestead and other property.

649 S.W.2d 307 (Tex. App. – Houston [7 Dist.] 1982). The lienholder does not need to give notice or record the lien – the self-executing nature of the lien means that the protection is automatic. *In re A&M Operating Co.*, 182 B.R. 997 (E.D. Tex. 1995), *aff'd* 84 F.3d 433 (5th Cir. 1996). The constitutional lien is not without limits, however, and it may be asserted only by one in privity with the owner of the property in question. *Id*. Thus, subcontractors who are not in privity with the property's owner may not assert a mechanic's lien without compliance with the provisions of Chapter 53 of the Texas Property Code.[21] Moreover, an original contractor – *i.e.*, a person contracting with an owner either directly or through the owner's agent, *see* Tex. Prop. Code Ann. §53.001(7) (Vernon 1997), must comply with the statutory requirements for perfection set forth in Chapter 53 of the Texas Property Code to render the lien effective as to a third party. *Cavazos*, at 681-682.

Article 16, Section 50 of the Texas Constitution complements Article 16, Section 37, by providing that a homestead is protected from forced sale for the payment of all debts except those specified therein – one of which is for "work and material used in constructing improvements thereon," under certain specified conditions. Therefore, a constitutional mechanic's lien claimant must also comply with the conditions set forth in Article 16, Section 50 in order to fix such a lien on a homestead.

---

[21] Some of the cases refer to both subcontractors and "derivative claimants" – *i.e.*, a claimant other than the original contractor. *See, e.g. Page v. Structural Wood Components*, 102 S.W.3d 720 (Tex. 2003); Tex. Prop. Code Ann. § 53.056 (Vernon 1997). The Court has been unable to locate a single case in Texas, whose constitutional lien is unique among the 50 states, addressing the question of whether an assignee of the original contractor, as opposed to a subcontractor, must perfect the lien in the manner provided by Chapter 53 of the Texas Property Code. However, it is axiomatic that an assignee walks in the shoes of the assignor. *State v. Oakley*, 181 S.W.3d 855 (Tex. App. – Austin 2005), and other courts in other jurisdictions have held that when a perfected lien is assigned, no new lien is created, and therefore, an assignee of a lien which has been perfected succeeds to the perfected status via the assignment and may assert the lien. *In re Wuerzberger*, 284 B.R. 814 (Bankr. W.D. Va. 2002); *In re Field*, 263 B.R. 323, 329 (Bankr. D. Idaho 2001).

The requirements for the fixing and perfection of a statutory mechanic's lien are set forth in Chapter 53 of the Texas Property Code. It provides the framework for the fixing and perfection of such liens by claimants other than the original contractor, and by an original contractor seeking to make his constitutional lien effective against third parties.

The loan documents in this case make reference to two types of mechanic's liens – a "contractual mechanic's lien," and a mechanic's lien under Article 16, Section 37 of the Texas Constitution. *See, e.g.*, Ex. 1 (the Note), at ¶¶ 3, 5, 9. Texas does not recognize a "contractual mechanic's lien," as such. Rather, as set forth above, Texas will recognize, as a statutory mechanic's lien, a lien granted by contract where the lien claimant complies with the statutory requirements for the fixing of a mechanic's lien. To the extent Wilmington claims such a lien, the Court agrees with the Debtor that Wilmington has not produced evidence of perfection, and the Court rejects Wilmington's argument that Texas Property Code Section 41.001 excuses compliance with all provisions of Chapter 53 except those set forth in Section 53.254.[22] Section 41.001 does not address lien perfection – it is an exemption statute addressing the homestead exemption.

However, to the extent that Wilmington asserts a lien under Article 16, Section 37 of the Texas Constitution, the Court concludes that Wilmington has established its status as the holder of such a lien. As assignee of the original contractor, Wilmington is entitled to assert the lien. *See* p. 32, n. 21, *supra*. Wilmington is asserting the lien against the original owner, and not a third party. There is no question that the original contractor built the house and that the Debtor is currently living

---

[22] The Court notes that Wilmington also refers the Court to a statute that did not exist when the loan documents were executed. Rather, in 1996, the applicable statute referred to by Texas Property Code Section 41.001 was Section 53.059.

there. There is no dispute that Wilmington has complied with Art. 16, Section 50 of the Texas Constitution as it existed in 1996 for the creation of a lien on homestead property (*i.e.,* the contract was for work and material used in constructing improvements on the homestead, the contract was in writing, with the consent of both spouses, etc.). Since Wilmington has complied with the requirements of Article 16, Section 50 of the Texas Constitution and with Section 53.059 of the Texas Property Code (now, Section 53.254) Wilmington need not otherwise have perfected its lien in the manner provided for perfection of statutory mechanic's liens under Chapter 53 of the Texas Property Code. *Cavazos*, at 683.

For these reasons, Wilmington has established that it holds a valid constitutional mechanic's lien, which survived the Second Case.[23]

The Debtor's second, brand-new post-hearing argument is that Wilmington "failed to define the type of housing that Jim Walter Homes built. According to the Debtor, if the housing was "Manufactured Housing," then Section 2.001 of the Texas Property Code applies, and that section requires the filing of a "certificate of attachment described by the Texas Manufactured Housing Standards Act," yet no such evidence of the filing of a certificate of attachment has been provided. *See Mem. of Law Regarding State Law Issues Raised at the Hearing on the Motions for Relief*

---

[23] The provisions of the Retail Installment Contract and Mechanics Lien with Power of Sale also contain indicia that the parties intended to create a mortgage and deed of trust. To constitute a mortgage, the grantor of real property must have intended to pledge property for the payment of a sum of money. *South Texas Bank v. Renteria*, 523 S.W.2d 780 (Tex. Civ. App. 1975). "If the transaction itself, despite the form of the instrument and regardless of the label affixed by the parties to the transaction, is, in fact, designed as a security for the payment of money . . . equity will treat it as a mortgage." *Id*. A deed of trust is a mortgage with a power to sell on default. *Starcrest Trust v. Berry*, 926 S.W.2d 343 (Tex. App. – Austin 1996). The loan documents at issue here contain such a power, and purport to convey the Property to the named trustee as security for the payment of the debt set forth in the Note. There is no dispute that the documents were duly recorded and the Debtor has not raised any challenges, other than those set forth in this Memorandum Opinion and Order, to either the existence of a valid deed of trust or its perfection. Therefore, the Court finds that Wilmington has sufficiently established that it also holds a perfected deed of trust lien on the Property.

*from Stay . . . ."* filed May 30, 2006*, ¶ 2 (Doc. No. 38 in the Current Case).

The Court will not address this hypothetical argument for several reasons. First, the Debtor does not assert that the home on the Property *is* a manufactured home. Rather, the Debtor asserts that *if* it's a manufactured home, then certain provisions of the Texas Property Code apply. It is not appropriate for this Court to rule on a hypothetical argument, and the Court does not believe that it is Wilmington's burden to show perfection of every type of lien that can possibly exist under Texas law. Having established one type of valid lien, the burden shifts to the Debtor to allege any additional challenges the Debtor may have.[24] Second, this argument was raised for the first time *after* the evidence was closed and Wilmington no longer had the opportunity to put on evidence. Third, the Debtor misstates the effect of the statute he cites – while Section 2.001 of the Texas Property Code does require the filing of a certificate of attachment, the only effect of that filing is that the manufactured home will then be considered real, rather than personal, property. The statute does not purport to address any lien perfection issues, and the Debtor fails to explain how the Property being considered as either real or personal property will affect the outcome here. Last, the Court agrees with Wilmington that the original Note and Lien Contract refer in several places to the building of a "house" on the Kleibrink's property. There is nothing to suggest on the face of the documents that this is a manufactured home, and the Debtor has not even asserted, let alone put on evidence, that it is.

---

[24] The Court finds the scattered, shotgun approach used by the Debtor to challenge Wilmington's lien frustrating. The Debtor has raised arguments serially, instead of concurrently, has raised new arguments post-hearing, has raised arguments stated hypothetically, has failed to support many of the arguments raised with citation to legal authority, and has cited the Court to authority which is clearly inapplicable. One wonders if Debtor's counsel gave any thought to the requirements of Fed. R. Bankr. P. 9011. However, Wilmington has also represented itself poorly in this and prior cases involving the Debtor, including the failure to bring a witness to the hearing on the Motions (a recurring problem) and the failure to prove up the amount still owed on the Note.

**D.      Relief from Stay**

      **i.      Stay Motion 1**

Section 362(d) of the Bankruptcy Code provides:

On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay--
(1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
(2) with respect to a stay of an act against property under subsection (a) of this section, if-
      (A) the debtor does not have an equity in such property; and
      (B) such property is not necessary to an effective reorganization . . .

The party requesting relief from the automatic stay bears the burden of proof on the issue of the debtor's equity in property, and the party opposing such relief has the burden of proof on all other issues. 11 U.S.C. § 362(g). The courts have interpreted this provision to mean that the party opposing stay relief has the ultimate burden of persuasion as to all issues except the existence of equity, but the party requesting relief from the automatic stay "must sustain an intial burden of production or going forward with the evidence to establish that a *prima facie* case for relief exists" before the debtor is obligated to go forward with his proof. *In re Self*, 239 B.R. 877, 880 (Bankr. E.D. Tex. 1999). If the movant fails to establish a *prima facie* case for relief from stay, its request for relief from stay should be denied. *Id*.

The Court has concluded that Wilmington has an interest in the Property, for all of the reasons set forth above. To establish a prima facie case for cause for relief from the automatic stay in a bankruptcy case, however, a movant must also demonstrate "that a decline in the value of its collateral is either occurring or is threatened . . . ." *In re Self*, 239 B.R. at 881; *In re Box*, 324 B.R. 290, 292 (Bankr. S.D. Tex. 2005); *In re Kowalsky*, 235 B.R. 590, 594 (Bankr. E.D. Tex. 1999). For purposes

of determining whether a secured creditor's interest is adequately protected, courts must analyze the property's equity cushion, which is the value of the property after deducting the claim of the creditor seeking relief from the stay and all senior liens. *In re Mendoza*, 111 F.3d 1264 (5th Cir. 1997). Only when the movant establishes its *prima facie* case does the burden shift to the debtor to prove that the secured creditor is adequately protected. *In re Self*, 239 B.R. at 881; *see also In re Mirant Corp.*, 303 B.R. 319, 330 n. 22 (Bankr. N.D. Tex. 2003) ("though the burden of proving the absence of cause is on Debtors, [the creditor] has the burden of going forward and establishing a 'cause' which Debtors must then disprove").

Wilmington is in the somewhat anomalous position of holding a valid lien against the Property but, by virtue of the Debtor's discharge in the Second Case, having nothing owed to it *by the Debtor*. However, the Debtor's discharge in the Second Case did not extinguish the debt – only the Debtor's personal liability for the debt. Therefore, while the Court believes that a debt still exists, Wilmington failed to introduce any evidence of its amount.[25] Without any evidence of the amount of the debt, the Court is unable to find cause to lift the stay. While the Debtor testified that he believes the Property is worth about $100,000, the Court is unable to determine whether Wilmington's interest in the Property is adequately protected.[26] Stay Motion 1 is therefore denied without prejudice.

---

[25] Wilmington did not bring a witness to the final hearing. Wilmington offered into evidence an affidavit of Teresa Nichols, a Bankruptcy Manager for the mortgage company which services Wilmington's accounts, which purported to state the unpaid balance of the Note, but the Court sustained the Debtor's objection to the admission of that affidavit on hearsay grounds. Similarly, the Court sustained the Debtor's objection to the admission of Wilmington's proof of claim to prove the truth of the matters asserted therein. The proof of claim was admitted only to prove that a claim was filed. Nor did Wilmington offer into evidence any account payment histories from which the balance of the Note could be ascertained. Since the Debtor did not stipulate to the amount of any unpaid debt, and listed the debt on his schedules as "disputed," there is simply no evidence before the Court regarding the amount of the Note Wilmington claims is unpaid.

[26] The Court notes that although the Debtor proposes to pay Wilmington nothing in his Chapter 13 plan (since his personal liability on the debt has been discharged), Wilmington's interest in the Property could theoretically be adequately protected by a significant equity cushion which would support its interest in the Property for the life of

### ii.     Stay Motion 2

Section 1301 (c) provides:

(c) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided by subsection (a) of this section with respect to a creditor, to the extent that –

* * *

(2) the plan filed by the debtor proposes not to pay such claim.

11 U.S.C. § 1301(c).  It is undisputed that the Debtor's proposed plan in the Current Case does not propose to pay Wilmington anything.

While it might initially appear that Wilmington lacks any claim to be paid, by virtue of the Debtor's discharge in the Second Case, that argument has been foreclosed by the Supreme Court's ruling in *Johnson v. Home State Bank*, 501 U.S. 78 (1991).  The *Johnson* court held that a mortgage lien securing an obligation for which a debtor's personal liability has been discharged is a "claim" within the meaning of Section 101(5).[27]  Because the Debtor does not propose to pay Wilmington's claim under the plan, Wilmington has established that it is entitled to relief from the co-debtor stay under the express terms of Section 1301(c)(2).  Relief from the co-debtor stay is therefore granted.

## III.    Conclusion

Wilmington has a perfected lien that survived the Second Case.  Based on this evidentiary

---

the plan despite the lack of payments.

[27] The issue before the Supreme Court in *Johnson* was whether a Chapter 13 debtor could include in his plan of reorganization payments for arrears on a mortgage, where his personal liability on the notes secured by the mortgage had been discharged in a prior Chapter 7 case.  The Supreme Court held that the mortgage lien, which had survived the Chapter 7 case, was nevertheless a "claim" against the debtor that could be rescheduled under Chapter 13, thus effectively approving of those cases which have now become known as "Chapter 20" cases.  It did so on the ground that even after the debtor's personal obligation has been extinguished, the mortgage holder still has a "right to payment," in the form of its right to the proceeds from the sale of the debtor's property and, at the very least, the creditor's surviving right to foreclose on the mortgage can be viewed as a "right to an equitable remedy" under the Bankruptcy Code's definition of the term "claim."  *See* 11 U.S.C. § 101(5).

record, the Court is unable to conclude that there is cause for relief from the automatic stay in connection with Stay Motion 1. The co-debtor stay must be lifted because the Debtor does not propose to pay Wilmington's claim in the Current Case. It is therefore

ORDERED that Stay Motion 1 is denied without prejudice; and it is further

ORDERED that Stay Motion 2 is granted.

# # # END OF ORDER # # #